**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**JEREMY SHANE SKAGGS** **PLAINTIFF**

**v.** **Case No. 4:22-cv-01029-LPR**

**WHITNEY HOWELL and**
**BENJAMIN HOWELL** **DEFENDANTS**

**ORDER**

Plaintiff Jeremy Skaggs and Defendant Benjamin Howell are both military men. At the times relevant to this lawsuit, they were employees of both the United States Air Force and the Arkansas Air National Guard.[1] In fact, at one point (and quite importantly to this case), Mr. Howell was briefly Mr. Skaggs's supervisor.[2] Defendant Whitney Howell is Mr. Howell's wife.[3]

Mr. Skaggs is suing each of the Howells for, among other things, defamation, abuse of process, and false light invasion of privacy.[4] For reasons that will be explained below, today's Order only concerns the claims that Mr. Skaggs has brought against Mr. Howell. As to those claims, Mr. Skaggs takes issue with (1) Mr. Howell's intra-military report that Mr. Skaggs raped Mrs. Howell, and (2) Mr. Howell's statement of similar substance to local law enforcement.[5] Mr. Skaggs alleges that Mr. Howell knew that the rape allegations were false at the time he made the report and statement.[6] Mr. Skaggs further alleges that the Howells trumped up the rape

---

[1] Ex. A (Fourth Benjamin Howell Aff.) to Defs.' Second Suppl. Br. in Resp. to Mot. to Remand (Doc. 40-1) ¶ 2; *see also* Pl.'s Resp. to Defs.' Statement of Facts (Doc. 97) ¶ 2.

[2] *See* Ex. A (Benjamin Howell Decl.) to Pet. for Substitution (Doc. 67-1) ¶ 3.

[3] Ex. A (Benjamin Howell Aff.) to Resp. to Pl.'s Mot. for Partial Summ. J. (Doc. 15) ¶ 1.

[4] *See* Compl. (Doc. 2) ¶¶ 17–22.

[5] *See id.* ¶¶ 5–10. The parties inconsistently refer to the incident between Mr. Skaggs and Mrs. Howell as "rape" (or alleged "rape") and "sexual assault" (or alleged "sexual assault"). *Compare id.* ¶ 5, *with* Ex. A (Whitney Howell Aff.) to Whitney Howell's Mot. for Partial Summ. J. (Doc. 81-1) ¶ 3. For purposes of this Order, nothing turns on this difference in terminology.

[6] *See* Compl. (Doc. 2) ¶¶ 5–6, 10, 19.

allegations to avoid making good on a real-estate-related contract into which the Howells and Mr. Skaggs had entered.[7]

This case is not yet at the merits stage. The Court is not, at this juncture, called upon to determine whether Mr. Skaggs raped Mrs. Howell, whether Mr. Howell made a knowingly false report, or whether Mr. Howell had ulterior motives for making his report. Instead, today's Order concerns a threshold procedural issue: whether Mr. Howell was acting in the scope of his employment when he took the actions underlying Mr. Skaggs's claims for defamation, abuse of process, and false light invasion of privacy. If Mr. Howell was acting in the scope of his employment, the Court must substitute the United States as a defendant in place of Mr. Howell with respect to those claims. Otherwise, those claims will proceed against Mr. Howell individually.

Mr. Howell has long maintained that he was acting in the scope of his employment. Pursuant to 28 U.S.C. §§ 2679(c) and 2679(d)(1), Mr. Howell asked the United States to certify that he was acting in the scope of his employment and thus substitute for Mr. Howell as a defendant on the above-noted claims.[8] The United States declined to do so.[9] So Mr. Howell petitioned this Court to approve the requested certification and force the requested substitution.[10] The Court has the power to do this under 28 U.S.C. § 2679(d)(3). And, for the reasons set out below, the Court has concluded that certification and substitution are appropriate here. Mr. Howell's Petition is therefore GRANTED.[11]

[7] *See id.* ¶ 5. Mr. Skaggs is also suing Mrs. Howell for defamation, abuse of process, and false light invasion of privacy. *See id.* ¶¶ 17–22. These claims are based on Mrs. Howell's filing of a police report asserting that Mr. Howell raped her. *See id.* ¶¶ 5–10.

[8] *See* Pet. for Substitution (Doc. 67) at 5–7.

[9] *See id.* at 5.

[10] *Id.*

[11] Doc. 67.

## BACKGROUND

Mr. Howell has been in the military for more than two-and-a-half decades.[12] For much of that service, including at all times relevant to the instant case, Mr. Howell has served as a dual-status technician in the Arkansas Air National Guard.[13] Similarly, at all times relevant to the instant case, Mr. Skaggs was a federal dual-status National Guard technician with the U.S. Air Force.[14]

In November of 2015, Mr. Skaggs entered into an agreement with the Howells whereby Mr. Skaggs agreed to furnish materials and labor for the improvement and remodeling of real property located at 65 Pheasant Run Drive in Cabot, Arkansas.[15] The record is unclear as to whether this was the Howells' primary residence at the time or, instead, an investment property.[16] In any event, the parties agree that the basic deal was that the improved and remodeled property would be sold, that the Howells would realize the first $40,000 of the proceeds from this sale, and that Mr. Skaggs would receive the remaining sale proceeds.[17]

At some point—it is unclear when—the relationship between Mr. Skaggs and the Howells soured. One potential souring point was August 27, 2016, when some type of sexual incident occurred between Mr. Skaggs and Mrs. Howell at Mrs. Howell's birthday party.[18] The nature of

---

[12] Ex. A (Fourth Benjamin Howell Aff.) to Defs.' Second Suppl. Br. in Resp. to Mot. to Remand (Doc. 40-1) ¶ 1.

[13] *Id.*

[14] *Id.* ¶ 2.

[15] Ex. A (State Court Docs.) to Notice of Removal (Doc. 1) at 155, ¶ 3; Compl. (Doc. 2) ¶ 24; Answer (Doc. 3) ¶ 25.

[16] In a previous Order, the Court referred to this property as the Howells' home. Order (Doc. 48) at 1. But that was based on the allegations in the Complaint. *See id.* Here, where the Court can look to the evidentiary record and subsequent filings (as opposed to strictly looking at the allegations in the Complaint), there are strong (but inconclusive) indications that the property in question is not the Howells' home. *See, e.g.*, Br. in Supp. of Pl.'s Mot. for Partial Summ. J. (Doc. 14) at 1 (characterizing the property as "Defendants' former home"); Resp. to Pl.'s Mot. for Partial Summ. J. (Doc. 15) ¶ 1 (characterizing the property as "certain real property owned by Defendants"). The Court need not resolve this factual issue because it is not material to the outcome of the certification question.

[17] Ex. A (State Court Docs.) to Notice of Removal (Doc. 1) at 155, ¶ 3; Resp. to Pl.'s Mot. for Partial Summ. J. (Doc. 15) ¶¶ 1–2.

[18] *See* Ex. A (Whitney Howell Aff.) to Whitney Howell's Mot. for Partial Summ. J. (Doc. 81-1) ¶ 3.

the incident is hotly contested by the parties.[19] All parties agree that Mr. Skaggs and Mrs. Howell had sexual relations.[20] The Howells say that the interaction was not consensual because Mrs. Howell was too drunk to consent.[21] Mr. Skaggs says that the interaction was consensual, that Mrs. Howell actually initiated it, and that Mrs. Howell was not too drunk to consent.[22]

The Howells did not report the (alleged) rape to either military or civilian authorities for over 15 months.[23] The record does not reveal whether Mr. Skaggs did any work on the house during this 15-month period. In any event, our story picks up on December 27, 2017. On that date, Mr. Howell was called into a meeting with his immediate superior officer, Captain Richard Sugg.[24] Capt. Sugg informed Mr. Howell that Mr. Skaggs was being moved into a position that would place Mr. Howell in Mr. Skaggs' direct chain of command.[25] Indeed, the move would turn Mr. Howell into Mr. Skaggs's immediate supervisor.[26]

Mr. Howell immediately told Capt. Sugg that the move would be a "bad idea" and attempted to get Capt. Sugg to reconsider his decision.[27] Capt. Sugg pressed Mr. Howell for details, but Mr. Howell was less than forthcoming.[28] Instead, Mr. Howell "vaguely informed

---

[19] *Compare id.*, *and* Ex. A (Fourth Benjamin Howell Aff.) to Defs.' Second Suppl. Br. in Resp. to Mot. to Remand (Doc. 40-1) ¶¶ 10–11, *with* Ex. A (State Court Docs.) to Notice of Removal (Doc. 1) at 156, ¶ 10.

[20] *See* Ex. A (State Court Docs.) to Notice of Removal (Doc. 1) at 155, ¶ 10; Ex. A (Whitney Howell Aff.) to Whitney Howell's Mot. for Partial Summ. J. (Doc. 81-1) ¶ 3; Ex. A (Fourth Benjamin Howell Aff.) to Defs.' Second Suppl. Br. in Resp. to Mot. to Remand (Doc. 40-1) ¶¶ 10–11.

[21] *See* Ex. A (Fourth Benjamin Howell Aff.) to Defs.' Second Suppl. Br. in Resp. to Mot. to Remand (Doc. 40-1) ¶¶ 10–11; *see also* Ex. A (Whitney Howell Aff.) to Whitney Howell's Mot. for Partial Summ. J. (Doc. 81-1) ¶ 3.

[22] Ex. A (State Court Docs.) to Notice of Removal (Doc. 1) at 156, ¶ 10.

[23] *See* Ex. A (Whitney Howell Aff.) to Whitney Howell's Mot. for Partial Summ. J. (Doc. 81-1) ¶¶ 3–4.

[24] Ex. A (First Benjamin Howell Aff.) to Defs.' Br. in Resp. to Mot. to Remand (Doc. 19-1) ¶ 4.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[Capt. Sugg] that an incident occurred with [Mr. Howell's] wife more than a year prior . . . ."[29] Mr. Howell also told Capt. Sugg that "providing further details would make [Capt. Sugg] a mandatory reporter under military regulations."[30] Capt. Sugg was unwilling to reverse his decision unless Mr. Howell provided further details.[31]

It does not appear that Mr. Howell provided any more details during that initial discussion, because Capt. Sugg stood by his decision and thus assigned Mr. Skaggs as Mr. Howell's subordinate.[32] Once Mr. Skaggs was placed under Mr. Howell in the chain of command, Mr. Howell contacted (via email) the Sexual Assault Response Coordinator, Lieutenant Colonel Tracy Nolley.[33] Mr. Howell sent this email after receiving advice from "military experts that [he is] trained to request assistance from, such as the Judge Advocate General (JAG), Inspector General (IG), Office of Special Investigation (OSI), and [his] commanding officer."[34] The email to Lt. Col. Nolley triggered the beginning of the reporting process.

Shortly thereafter, on January 4, 2018, Mr. Howell personally visited Lt. Col. Nolley's office.[35] Mr. Howell must have made his assertions of rape during this visit, because the record shows that Lt. Col. Nolley advised Mr. Howell that a formal report would need to be filed before any action could be taken.[36] Later that day, Mr. and Mrs. Howell met with Lt. Col. Nolley and another Sexual Assault Response Coordinator.[37] Lt. Col. Nolley and the other Sexual Assault

---

29 *Id.*

30 *Id.*

31 *Id.*

32 *Id.* ¶¶ 4, 6.

33 *Id.* ¶ 6.

34 Ex. A (Benjamin Howell Decl.) to Pet. for Substitution (Doc. 67-1) ¶ 6.

35 Ex. A (First Benjamin Howell Aff.) to Defs.' Br. in Resp. to Mot. to Remand (Doc. 19-1) ¶ 6.

36 Ex. A (Whitney Howell Aff.) to Whitney Howell's Mot. for Partial Summ. J. (Doc. 81-1) ¶ 5.

37 *Id.* ¶ 6.

Response Coordinator recommended that Mrs. Howell file a report about the alleged rape.[38] Consistent with this recommendation, the report was filed.[39]

The next day—January 5, 2018—two things happened. First, Mr. Howell informed Capt. Sugg of the report.[40] In response, Capt. Sugg indicated that he was already aware of the report and asked Mr. Howell to provide more details about the alleged rape.[41] Mr. Howell then provided the requested details to Capt. Sugg.[42] Second, representatives of the Air Force Office of Special Investigations notified the Cabot Police Department about the allegations.[43] On January 8, 2018, an officer with the Cabot Police Department asked Mrs. Howell to come to the station and give an informational statement about the incident.[44] Although she did so, she did not identify Mr. Skaggs in this statement.[45]

Nothing more appears to have happened until March 15, 2018. On that day, Captain Scott Lang (who had recently taken over the Sexual Assault Response Coordinator responsibilities from Lt. Col. Nolley[46]) and Mr. Howell had a further conversation about the alleged rape.[47] The record

---

[38] *Id.*

[39] *Id.*; Ex. A (First Benjamin Howell Aff.) to Defs.' Br. in Resp. to Mot. to Remand (Doc. 19-1) ¶ 6. It is a bit unclear in the record whether the report was filed by Mr. Howell, Mrs. Howell, or both (either jointly or separately). *Compare* Ex. A (First Benjamin Howell Aff.) to Defs.' Br. in Resp. to Mot. to Remand (Doc. 19-1) ¶ 6 (Mr. Howell stating that he "visited Lt. Col. Nolley's office on January 4, 2018, and officially filed a report"), *with* Ex. A (Whitney Howell Aff.) to Whitney Howell's Mot. for Partial Summ. J. (Doc. 81-1) ¶ 6 (Mrs. Howell stating that "Nolley and [the other SARC officer] recommended that [Mrs. Howell] file an unrestricted SARC report about the incident," and that she "completed the report that day"). This is likely immaterial, because what matters for Mr. Skaggs's claims is that both Mr. and Mrs. Howell were involved in the process of reporting the alleged rape to the military and clearly made statements to military authorities during the reporting process.

[40] Ex. A (First Benjamin Howell Aff.) to Defs.' Br. in Resp. to Mot. to Remand (Doc. 19-1) ¶ 6.

[41] *Id.*

[42] *Id.*

[43] Ex. A (Whitney Howell Aff.) to Whitney Howell's Mot. for Partial Summ. J. (Doc. 81-1) ¶ 7.

[44] *Id.* ¶ 8.

[45] *Id.*

[46] *Id.* ¶ 9.

[47] *Id.* ¶ 10.

does not reveal whether it was Capt. Lang or Mr. Howell who instigated this conversation. What we do know is that Capt. Lang advised Mr. Howell that a military investigation of the alleged rape could not be conducted unless a civilian investigation was initiated by local authorities.[48] Capt. Lang told Mr. Howell that this was because Mr. Skaggs was acting in his civilian capacity at the time of the alleged rape.[49]

The record does not reveal whether Capt. Lang asked (or encouraged) Mr. Howell to do anything with respect to the civilian authorities. But the record does reveal that—later this same day—Mrs. Howell and Capt. Lang went together to the Cabot Police Department to discuss opening an investigation into the alleged rape.[50] And, at the police station, Capt. Lang assisted Mrs. Howell in completing the necessary paperwork, including an affidavit.[51] The Howells were eventually interviewed by the police concerning the alleged rape. At the request of the police, Mrs. Howell sat for an interview with the Cabot Police Department on March 19, 2018.[52] Similarly, on an unspecified date, Mr. Howell was called to the Cabot Police Department to sit for an interview concerning the alleged rape.[53]

No criminal charges concerning the alleged rape were brought against Mr. Skaggs.[54] But, at the time the allegations were initially made, Mr. Skaggs was reassigned at work into a position outside of Mr. Howell's chain of command.[55] Mr. Skaggs describes the new position as "menial[,]

---

[48] *Id.*

[49] *Id.*

[50] *Id.* ¶ 11.

[51] *See id.*

[52] *Id.* ¶ 12.

[53] *See* Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 25. The written record does not say anything about Mr. Howell being interviewed. But, at oral argument, Mr. Howell's counsel conceded that (at some unknown date) Mr. Howell was called to the Cabot Police Department to sit for an interview concerning the alleged rape. *See id.*

[54] Ex. A (Whitney Howell Aff.) to Whitney Howell's Mot. for Partial Summ. J. (Doc. 81-1) ¶ 15.

[55] *See* Ex. A (First Benjamin Howell Aff.) to Defs.' Br. in Resp. to Mot. to Remand (Doc. 19-1) ¶ 7.

more physically demanding," and "demeaning."[56] And, according to Mr. Skaggs, this whole episode was nothing more than the Howells trying to get out of their real-estate-related contract with Mr. Skaggs.[57] As support for this proposition, Mr. Skaggs points to subsequent actions taken by the Howells. For example, Mr. Skaggs alleges that, in May of 2018, he returned to the Pheasant Run property—from an out-of-town trip—to find some of his personal property removed.[58] He believes this was part of an attempt by the Howells to keep him off the property and to renege on their contract (including by selling the Pheasant Run home without paying Mr. Skaggs the agreed-upon moneys).[59]

**PROCEDURAL HISTORY**

Mr. Skaggs filed the instant lawsuit in state court on May 16, 2018.[60] The Complaint pled a variety of claims against Mr. Howell. Only three are relevant to today's Order: defamation, abuse of process, and false light invasion of privacy.[61] The abuse of process and false light invasion of privacy claims concern both Mr. Howell's reporting of the alleged rape to his military superiors and Mr. Howell's statements made to local law enforcement.[62] The defamation claim, however, only concerns Mr. Howell's statements made to local law enforcement.[63] That is because

---

[56] Ex. A (State Court Docs.) to Notice of Removal (Doc. 1) at 156, ¶ 8.

[57] *See* Ex. A (Jeremy Skaggs Aff.) to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 97-1) ¶ 9.

[58] *See id.* ¶ 6; Ex. C (Jeremy Skaggs's Resp. to Interrogs.) to Whitney Howell's Mot. for Partial Summ. J. (81-3) at 2.

[59] Ex. A (State Court Docs.) to Notice of Removal (Doc. 1) at 156, ¶¶ 6, 11; Ex. C (Jeremy Skaggs's Resp. to Interrogs.) to Whitney Howell's Mot. for Partial Summ. J. (81-3) at 2.

[60] Notice of Removal (Doc. 1) ¶ 1.

[61] *See* Compl. (Doc. 2) ¶¶ 17–22. Mr. Skaggs also pled claims sounding in contract, quasi-contract, and property law. *See id.* ¶¶ 11–16, 23–29. These claims stem from an alleged contract regarding the improvement of certain real property between Mr. Skaggs and the Howells. *See id.* ¶¶ 2–4. The Court has not discussed in detail the facts and factual allegations surrounding—or the claims stemming from—this alleged contract for two reasons. The first is that it has already explicated them in detail in a previous Order. *See* Order (Doc. 48) at 1–3. The second is that the alleged contract is not (directly) relevant to the legal questions at the heart of today's Order.

[62] Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 63.

[63] *See id.* at 62.

Mr. Skaggs has disavowed any defamation claim concerning Mr. Howell's report of the alleged rape to his military superiors.[64]

Defendants removed the case to federal court in October of 2022.[65] Mr. Skaggs filed a Motion to Remand back to state court in November of 2022, asserting a lack of subject matter jurisdiction.[66] In considering whether or not to grant the requested remand, the Court had to grapple with an incredibly difficult issue: whether 28 U.S.C. § 1442a gave the Court subject matter jurisdiction over the instant case.[67] That statute provides as follows:

> A civil or criminal prosecution in a court of a State of the United States against a member of the armed forces of the United States on account of an act done under color of his office or status, or in respect to which he claims any right, title, or authority under a law of the United States respecting the armed forces thereof, or under the law of war, may at any time before the trial or final hearing thereof be removed for trial into the district court of the United States . . . .[68]

The Court first determined that Mr. Howell was a member of the "armed forces of the United States" as that term is used in the statute.[69] It then determined that this civil action was being prosecuted against him "on account of an act done . . . in respect to which he claims any right, title, or authority under a law of the United States respecting the armed forces thereof . . . ."[70] Because Mr. Howell (non-frivolously) argued that his reporting of the alleged rape was required by Air Force regulations, he claimed the right, entitlement, or authority to make said report under federal law.[71] Accordingly, the Court denied remand.

---

[64] *Id.*

[65] Notice of Removal (Doc. 1) at 1.

[66] Doc. 18.

[67] *See* Order (Doc. 48) at 8.

[68] 28 U.S.C. § 1442a.

[69] Order (Doc. 48) at 8–9.

[70] *Id.* at 10 (quoting 28 U.S.C. § 1442a).

[71] *Id.* at 10–11. The Court also made a few other preliminary determinations relevant to the instant Order. The Court concluded that the Air Force regulation relied on by Mr. Howell—AFI 90-6001—"qualifies as having 'the force and

The jurisdictional question would not be the last complex question of law this case would raise on account of Mr. Howell's military service and employment. On December 6, 2024, Mr. Howell filed the instant Petition invoking the Westfall Act.[72] The Westfall Act grants a federal employee immunity from suit when "acting within the scope of his office or employment at the time of the incident out of which the claim arose . . . ."[73] Generally, the Westfall Act accomplishes this by making a suit against the United States under the Federal Tort Claims Act the exclusive remedy in such a situation and providing a mechanism through which the United States substitutes as a defendant for the employee being sued.[74]

Under the Westfall Act, the usual path for an employee to receive immunity involves the Attorney General of the United States certifying that the employee was acting within the scope of employment at the time of the incident out of which the claim arose.[75] But the employee is not without recourse if the Attorney General refuses certification. The employee may, "at any time before trial," petition the court for certification that he was acting within the scope of his employment.[76]

---

effect of law.'" *Id.* at 11 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979)). The Court also concluded that Mr. Howell had a colorable argument that AFI 90-6001 applied to his report of the alleged rape. *Id.* at 12. The Court noted that Mr. Howell was (among other things) serving as an Air Force civilian employee at work, that Mr. Howell was Mr. Skaggs's supervisor with respect to Mr. Howell's status as an Air Force civilian employee, and that AFI 90-6001 applies to Air Force civilian employees. *Id.* at 12–13.

[72] Pet. for Substitution (Doc. 67).

[73] 28 U.S.C. § 2679(d)(1); *Osborn v. Haley*, 549 U.S. 225, 247 (2007).

[74] *See* 28 U.S.C. § 2679(b)(1); 28 U.S.C. § 2679(d)(1). There are limited exceptions to this statutory scheme. For example, a *Bivens* action can still be brought against an individual government employee. *United States v. Smith*, 499 U.S. 160, 166–67 (1991) (noting that 28 U.S.C. § 2679(b)(2) provides that "the FTCA is *not* the exclusive remedy for torts committed by Government employees in the scope of their employment when an injured plaintiff brings: (1) a *Bivens* action, seeking damages for a constitutional violation by a Government employee; or (2) an action under a federal statute that authorizes recovery against a Government employee"). The potential exceptions are not relevant here.

[75] 28 U.S.C. § 2679(d)(1).

[76] 28 U.S.C. § 2679(d)(3).

In our case, pursuant to the requirements of the Westfall Act, Mr. Howell properly requested certification from the Attorney General.[77] That request was denied on June 29, 2020.[78] Mr. Howell now requests that this Court "certify that the acts alleged in Plaintiff's Complaint against [Mr. Howell] in this matter were, for purposes of the Westfall Act, within the course and scope of his employment as a federal employee . . . ."[79] Mr. Howell further requests that, "upon such certification by the Court," the Court also issue "an order . . . substituting the United States as the sole party in place of Separate Defendant Benjamin Howell."[80] The United States opposed the requests, in briefing and at oral argument.[81] Mr. Skaggs did not file a brief, but opposed the requests at oral argument.[82]

## DISCUSSION

This Court reviews *de novo* the Attorney General's determination that Mr. Howell was not acting in the scope of his employment.[83] As the party seeking review, Mr. Howell bears the burden of rebutting the decision not to certify with specific facts.[84] Mr. Howell and the United States

[77] Pet. for Substitution (Doc. 67) at 6.

[78] *Id.* The Court notes that the letter denying Mr. Howell's request is not in the record. But the United States has not controverted any of the factual assertions on this point made in Mr. Howell's briefing. So the Court sees no good reason to doubt these assertions.

[79] *Id.* at 1.

[80] *Id.*

[81] Br. in Opp'n to Pet. for Substitution (Doc. 72); Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 35–36.

[82] *See* Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 56.

[83] *See Green v. Hall*, 8 F.3d 695, 698 (9th Cir. 1993).

[84] *See Lawson v. United States*, 103 F.3d 59, 60 (8th Cir. 1996). Relevant Eighth Circuit caselaw indicates the burden of proof is on the plaintiff when the plaintiff challenges the Attorney General's decision to certify. *See id.* District courts outside of this Circuit have held that the inverse is also true—the burden of proof is on the defendant when challenging a decision not to certify. *See, e.g.*, *Bohnenkamp v. Whisterbarth*, No. 19-CV-00115, 2023 WL 414442, at *4 (W.D. Penn. Jan. 25, 2023); *Colbert v. United States*, No. 09-cv-998, 2012 WL 12906168, at *8 (M.D. Fla. Nov. 21, 2012) ("[T]he party seeking review of the denial bears the burden of presenting evidence and disproving the Attorney General's decision by a preponderance of the evidence."); *Lacey-Echols ex rel. Lacey v. Murphy*, No. 02-2281, 2003 WL 23571269, at *6 (D.N.J. Dec. 17, 2003). The parties seem to agree that Mr. Howell bears the burden of proving he was acting in the scope of his employment. *See* Pet. for Substitution (Doc. 67) at 8; Jan. 30, 2025 Hr'g Tr. (Rough) at 35 ("[A]ll we're here to talk about today is whether Mr. Howell can meet his burden to prove [by] a

agree that certification and substitution are appropriate if (but only if) Mr. Howell's allegedly tortious conduct was done in the scope of his employment.[85]

## I. The Law

As set out in more detail above, the tort claims brought against Mr. Howell arise out of his intra-military reporting and his statements made to local law enforcement.[86] To appropriately decide the substitution issue for each tort claim, the Court must determine whether none, some, or all of the alleged tortious conduct was within the scope of Mr. Howell's employment. Whether Mr. Howell was acting within the scope of his employment is a question governed by Arkansas law.[87] And under Arkansas law, whether Mr. Howell was acting within the scope of his employment depends on whether he was "carrying out the object and purpose of the enterprise, as opposed to acting exclusively in his own interest."[88] That is a very pro-employee test. Indeed, even in a mixed-motive situation—where an employee acts in both his personal interest and the interest of the business—Arkansas law considers the act to fall within the scope of employment.[89]

---

preponderance of the evidence that the United States was wrong in denying certification. And that's his burden to prove that we were wrong in saying he was not in the scope of employment.").

[85] *See* Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 38–39 (United States agreeing that if Mr. Howell had been acting within the scope of his employment, then the Attorney General would have issued the requested certification). It is worth noting that Mr. Howell will remain in this case as a Defendant regardless of what the Court decides today. That is because the Complaint levies additional non-tort claims against Mr. Howell (including breach of contract and unjust enrichment). See Compl. (Doc. 2) ¶¶ 11–16, 23–29. Those other claims are not eligible for FTCA/Westfall Act immunity.

[86] *See supra* pages 5–7.

[87] *See Johnson v. United States*, 534 F.3d 958, 963 (8th Cir. 2008) ("Scope of employment questions are governed by the law of the state where the alleged tortious acts took place . . . .").

[88] *Razorback Cab of Fort Smith, Inc. v. Lingo*, 304 Ark. 323, 327, 802 S.W.2d 444, 446 (1991). Mr. Howell and the United States seem to be in agreement on the contours of the scope of employment under Arkansas law. *Compare* Br. in Opp'n to Pet. for Substitution (Doc. 72) at 5, *with* Reply in Supp. of Pet. for Substitution (Doc. 74) at 3–4. *See also* Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 17–18, 51–52.

[89] *See Vincennes Steel Corp. v. Gibson*, 194 Ark. 58, 62–63, 106 S.W.2d 173, 175 (1937).

And the scope of employment includes tortious conduct—even intentionally tortious conduct—so long as the conduct was "not unexpectable in view of the duties of the [employee]."[90]

The broad, inclusionary sweep of this rule is confirmed by the relevant Arkansas Model Jury Instructions:

> an employee is acting within the scope of his employment if he is engaged in the transaction of business which has been assigned to him by his employer *or if he is doing anything which may reasonably be said to have been contemplated as a part of his employment and is in furtherance of his employer's interests, even though it was not expressly authorized and may have been specifically forbidden*.[91]

This Model Jury Instruction has been blessed by the Arkansas Supreme Court as a correct statement of Arkansas scope-of-employment law.[92]

So we know the law to apply. But what about the facts?

## **II. The Facts**

When making a scope-of-employment-certification decision, the Court is supposed to first find the facts relevant to the law governing the certification analysis.[93] The Court can rely on verified pleadings, declarations, depositions, and other record evidence to make findings of fact. But if a material fact is genuinely in dispute (the familiar summary judgment standard), the Court must hold an evidentiary hearing to settle the factual record.[94]

---

[90] *Regions Bank & Tr. v. Stone Cnty. Skilled Nursing Facility, Inc.*, 345 Ark. 555, 567, 49 S.W.3d 107, 115 (2001) (quoting *Life & Cas. Ins. Co. of Tenn. v. Padgett*, 241 Ark. 353, 355, 407 S.W.2d 728, 729 (1966)).

[91] Ark. Model Jury Instr., Civil AMI 702 (emphasis added) (cleaned up).

[92] *See Nipper v. Brandon Co.*, 262 Ark. 17, 19, 553 S.W.2d 27, 28 (1977).

[93] *Cf. Osborn*, 549 U.S. at 249–51.

[94] *See Kearns v. United States*, 23 F.4th 807, 812 (2022). One might wonder why the Seventh Amendment right to a jury trial is not negatively implicated by a judge holding such an evidentiary hearing and then making factual findings. But this process seems to be what the Westfall Act requires and what the United States Supreme Court has approved. *See Osborn*, 549 U.S. at 252. In any event, and fortunately, neither the parties nor the Court believe an evidentiary hearing is needed in this case. *See* Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 16–17, 45.

For the purposes of this Petition, there are no genuinely disputed material facts.[95] The facts as stated in the Background section above are not controverted by any party in this case. It is true, of course, that there is disagreement between Mr. Skaggs and Mr. Howell concerning whether, at the time Mr. Howell reported the alleged rape (and subsequently gave a statement about it), Mr. Howell actually believed that Mr. Skaggs raped Mrs. Howell. Mr. Howell says yes, while Mr. Skaggs says no.[96] But this disagreement isn't relevant to the pending Petition. That is because Mr. Skaggs never argued that the Petition should be denied on the grounds that Mr. Howell's statements were knowingly false.[97]

Mr. Skaggs did not file a brief opposing Mr. Howell's request for certification and substitution. Indeed, the Court did not know until oral argument that Mr. Skaggs opposed certification and substitution. Even then, at oral argument, counsel for Mr. Skaggs only pressed the argument that the doctrine of laches should prevent Mr. Howell from seeking certification and substitution years on from the filing of the initial complaint in this case.[98] After counsel for Mr. Skaggs said he had "nothing else" for the Court, the Court noted that counsel had not pressed

---

[95] *See* Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 70.

[96] *See supra* page 4.

[97] The opportunity to argue this was open to Mr. Skaggs and to the United States. A knowingly false report to an employer by an employee is, perhaps definitionally, not within the scope of employment. That is because, *inter alia*, such a report would not carry out the object or purpose of the employer. *Cf. Porter v. Harshfield*, 329 Ark. 130, 137, 948 S.W.2d 83, 86 (1997).

[98] *See* Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 56–57. The Court will not consider the laches argument because it was waived (or forfeited, *see infra* note 101) by Mr. Skaggs's failure to submit a brief. The Court notes, however, that the direct language of the statute undermines the viability of any laches argument. See 28 U.S.C. § 2679(d)(3) ("In the event that the Attorney General has refused to certify scope of . . . employment under this section, the employee may *at any time before trial* petition the court to find and certify that the employee was acting within the scope of his . . . employment.") (emphasis added). It thus does not surprise the Court that Mr. Skaggs's counsel was unable to produce any case that applied the doctrine of laches to a situation like the one at hand. Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 58.

the sincerity-of-reporting point.[99] In response, counsel very briefly (and half-heartedly) asserted that Mr. Skaggs "would register that argument as well."[100]

The take-away from all this is that Mr. Skaggs waived (or at least forfeited) any opposition to Mr. Howell's certification and substitution requests.[101] Certainly, Mr. Skaggs waived (or forfeited) any opposition grounded in the sincerity-of-reporting point. The waiver (or forfeiture) occurred when Mr. Skaggs failed to timely oppose Mr. Howell's Petition by way of a responsive brief.[102] Given the waiver (or forfeiture), the sincerity of Mr. Howell's reporting is not at issue in the pending Petition. The party adverse to Mr. Howell for this Petition—the United States— took no position on the factual question. It did not expressly or impliedly controvert the fact. Quite the opposite, actually: The United States' briefing and statements made during oral argument treat the sincerity of the reporting as an established fact.[103]

Mr. Skaggs's arguments against waiver or forfeiture are not persuasive. At oral argument, Mr. Skaggs contended that he had not waived his ability to oppose the Petition because of the common-defense doctrine.[104] Mr. Skaggs said that, under this doctrine, the United States' response

[99] Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 59.

[100] *See id.* at 60. Mr. Skaggs's counsel's initial silence and then tepid response on this point are especially stunning because the Court itself had repeatedly raised this issue earlier in the argument. *Id.* at 6, 8–9, 14, 32–33; *see also id.* at 35–36.

[101] *See Reinard v. Crown Equip. Corp.*, 983 F.3d 1064, 1066 (8th Cir. 2020) ("[F]orfeiture is the 'failure to make the timely assertion of a right,' whereas waiver is the 'intentional relinquishment or abandonment of a known right.'" (quoting *Hamer v. Neighborhood Hous. Servs.*, 583 U.S. 17, 20 n.1 (2017))); *see also United States v. Campbell*, 26 F.4th 860, 889–90 (11th Cir. 2022) (en banc) (Pryor, C.J., concurring) (highlighting the differences between waiver and forfeiture with respect to failures of a party to brief an issue).

[102] *Cf. Bosch v. Thurman*, No. 22-cv-00677, 2024 WL 841252, at *1 n.4 (E.D. Ark. Feb. 28, 2024) ("[G]enerally, a party gives up an issue if it fails to respond to the other side's summary judgment argument on that issue.").

[103] *See generally* Br. in Opp'n to Pet. for Substitution (Doc. 72); *see also* Substitution Hr'g Tr. (Rough) at 48 (agreeing that the United States takes no position, for purposes of the instant petition, on the sincerity of the reporting). It would be highly unfair to Mr. Howell for the Court to consider Mr. Skaggs's arguments because they are significantly different from the arguments in the United States' briefing and were only raised at oral argument. Mr. Howell had no opportunity to brief a response.

[104] *See* Substitution Hr'g Tr. (Rough) at 3.

inures to his benefit.[105] This argument is easily dismissed. Even if the Court were to conclude that the common-defense doctrine applied, the doctrine would not preserve the sincerity-of-reporting argument or the laches argument. That's because the United States did not make these arguments.[106] The common-defense doctrine doesn't give Mr. Skaggs the ability to assert a legal theory that the United States did not assert in its Brief.[107] Simply put, the litigating positions of Mr. Skaggs and the United States are too different for common-defense treatment.[108]

Where does this leave us? First, there are no genuinely disputed facts for purposes of this Petition. Second, we do not need an evidentiary hearing. And third, we treat Mr. Howell's reporting of the alleged rape (and his subsequent statements to local law enforcement) as sincere.[109]

---

[105] *Id*. In support of his proposition, Mr. Skaggs's counsel cited *Angelo Iafrate Const., LLC v. Potashnick Const., Inc.*, 370 F.3d 715, 722 (8th Cir. 2004). *See* Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 4.

[106] *See, e.g.*, Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 55–56 (Mr. Skaggs's counsel stating that, when he "said earlier that we adopt the Government's position, it wasn't necessarily that we think that the sexual assault allegations are true or we're indifferent about them").

[107] *Cf. Angelo Iafrate*, 370 F.3d at 722 (common-defense doctrine is not available if the liability of the invoking party "is based on . . . a legal theory distinct from the one under which the answering party prevailed").

[108] In any event, it is completely unclear that the common-defense doctrine could even theoretically apply to the pending certification and substitution request. The common-defense doctrine is a creature of the common law, and it is typically invoked in a scenario where a defendant has failed to file an answer and seeks to avoid default judgment. *See, e.g.*, *Aldridge v. Watling Ladder Co.*, 275 Ark. 225, 228, 628 S.W.3d 322, 324 (1982). In such a scenario, a co-defendant's timely filed answer may save the invoking defendant from the entry of a default judgment. *See id.* Unlike that scenario, the circumstances at bar have none of the dire consequences associated with failing to file an answer. Mr. Skaggs isn't deemed to have admitted anything as a result of his failure to timely respond to the Petition for Substitution. And he isn't facing default judgment, or anything even remotely similar. It is therefore not surprising that Mr. Skaggs hasn't submitted any authority suggesting that the common-defense doctrine should apply in the present scenario, where Mr. Skaggs wishes to use the common-defense doctrine to preserve his right to make un-briefed arguments at oral argument. Indeed, the case Mr. Skaggs's counsel cited at the hearing was itself a default-judgment case, suggesting that the common-defense doctrine does not aid Mr. Skaggs here because he is not seeking to avoid default judgment. *See Angelo Iafrate*, 370 F.3d at 722.

[109] Subsequent to oral argument, Mrs. Howell filed a Motion for Partial Summary Judgment. Doc. 81. She also filed a Statement of Facts in support of that Motion. Doc. 82. Attached to Mr. Skaggs's Response to her Statement of Facts was a series of text messages between Mr. Skaggs and the Howells. *See generally* Ex. 2 (Text Messages) to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 97-2). In an affidavit that was also attached to Mr. Skaggs's Response to Mrs. Howell's Statement of Facts, Mr. Skaggs argues that these messages prove that the Howells' reporting of rape was both false and knowingly false. *See* Ex. 1 (Jeremy Skaggs Aff.) to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 97-1) ¶ 15. Putting aside whether those text messages can be used for purposes of evaluating Mrs. Howell's Motion, they certainly cannot be considered for the instant Petition. No party suggests otherwise.

## **III. Analysis**

There are essentially two sets of actions taken by Mr. Howell that the Court must analyze: (1) his intra-military reporting of the alleged rape; and (2) his statements to local law enforcement officials about the alleged rape.[110] The Court will address each of these in turn.

### A. The Reports to Military Authorities

As explained above, Arkansas law defines the scope of employment quite broadly. But the Court need not explore the outer fringes of that scope to address Mr. Howell's intra-military reporting of the (alleged) rape. That's because Mr. Howell was explicitly required to make such a report by the regulations that governed his employment.

Air Force Instruction 90-6001 § 3.7.3 requires "[a]ny military member or civilian employee . . . who receives a report of an adult sexual assault incident involving a subordinate in the individual's supervisory chain" to "report the matter to the SARC, Commander (or equivalent) and AFOSI . . . ."[111] Failure to observe this "mandatory provision[]" constitutes "a violation of Article 92, *Uniform Code of Military Justice*," and "may result in administrative disciplinary action . . . ."[112] AFI 90-6001 has the force and effect of law.[113] But it also created affirmative duties on Mr. Howell pursuant to his employment as a federal civilian employee of the Air Force. § 3.7.3 applies to "[a]ny . . . civilian employee . . . ."[114] In short, the relevant sexual-assault-

---

[110] As a reminder, there are false light invasion of privacy and abuse of process claims brought against Mr. Howell arising out of the report to his military superiors, whereas there are false light invasion of privacy, abuse of process, and defamation claims brought against Mr. Howell arising out of his statements to law enforcement. *See supra* pages 8–9.

[111] AFI 90-6001 § 3.7.3.

[112] AFI 90-6001 at 1.

[113] Order (Doc. 48) at 11.

[114] AFI 90-6001 § 3.7.3.

reporting requirement functioned as a workplace regulation that applied to Mr. Howell in his role as a Communications Maintenance Superintendent.[115]

When Mr. Howell was made Mr. Skaggs's direct supervisor, § 3.7.3 required Mr. Howell—because he was both an employee of the Air Force and Mr. Skaggs's direct supervisor—to report the alleged rape to the enumerated military entities. And that's exactly what Mr. Howell did in reporting to Capt. Sugg and the Sexual Assault Response Coordinator. At a minimum, compliance with such a regulation is something that has been "contemplated as a part of his employment and is in furtherance of his employer's interests . . . ."[116]

It is worth noting that, at oral argument, the United States conceded that Mr. Howell would have been acting in the scope of his employment if he had reported the alleged rape to Capt. Sugg when Capt. Sugg first informed Mr. Howell that Mr. Skaggs was going to be placed under Mr. Howell's supervision.[117] The Court agrees with that, but fails to understand the line the United States is trying to draw between the intra-military reporting in that hypothetical situation and the intra-military reporting that actually took place in the instant case.

From the oral argument and the United States' briefing, the Court's best approximation of the United States' argument goes like this. If Mr. Howell's motives were to advance the interests of his employer, he would have told Capt. Sugg the details of the rape allegation before Capt. Sugg formally made Mr. Skaggs a direct subordinate of Mr. Howell.[118] And the fact that Mr. Howell refused to do so—and only reported the alleged rape after he became Mr. Skaggs's supervisor—

[115] *See* Ex. A (First Benjamin Howell Aff.) to Defs.' Br. in Resp. to Mot. to Remand (Doc. 19-1) ¶ 1.

[116] Ark. Model Jury Instr., Civil AMI 702.

[117] *See* Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 38–39.

[118] *See* Br. in Opp'n to Pet. for Substitution (Doc. 72) at 7–8; Substitution Hr'g Tr. (Rough) at 37–40, 43.

proves Mr. Skaggs only made the report to avoid reprimand (or worse) for violating § 3.7.3.[119] This means—according to the United States—that Mr. Howell's motives for reporting were purely personal, and thus his intra-military reporting falls outside the scope of his employment.[120]

There are two serious problems with this argument. The first problem is that the Air Force has repeatedly stated that preventing sexual assault is an important goal of the organization.[121] And the Air Force regulations contained in AFI 90-6001 (including § 3.7.3) were adopted to help realize that goal.[122] Air Force employees complying with this regulation (assuming the reports are sincere) are *ipso facto* furthering the interests of the Air Force. So, assuming Mr. Howell believed the allegation to be genuine, he had to have been acting at least in part in the interest of the Air Force when he reported the allegation against Mr. Skaggs to his commanding officers. And under Arkansas scope-of-employment law, "at least in part" is sufficient.[123]

Consider, for example, a teacher who works for a school that requires her to report any suspected instances of child abuse to a state hotline. The fact that a state law might also require the same reporting does not diminish the force of the school's requirement. A teacher who makes

---

[119] *See* Br. in Opp'n to Pet. for Substitution (Doc. 72) at 7–8; Substitution Hr'g Tr. (Rough) at 37–40, 43.

[120] *See* Substitution Hr'g Tr. (Rough) at 43.

[121] *See* AFI 1-1 § 1.7.4.5 ("The United States Air Force will not tolerate sexual assault. Sexual assault undermines our mission readiness, directly contradicts our core values, and erodes the trust and confidence upon which our institution is built. All Airmen have the enduring responsibility to foster a climate of dignity and respect and to promote and ensure a culture that will not tolerate sexual assault or behaviors that support it."); AFI 90-6001 § 1.1 ("The SAPR Program reinforces the Air Force's commitment to . . . prevent and respond to sexual assault. . . . The Air Force's goal is to provide exemplary support throughout victim reporting, response, victim advocacy, investigations and offender accountability when a sexual assault occurs."); AFI 90-6001 § 1.4 ("Sexual assault is criminal conduct that violates the standards the United States of America expects of its men and women serving in the Air Force and is inconsistent with the Air Force['s] core values . . . ."); AFI 90-6001 § 1.4.1 ("Airmen will strive to eliminate sexual assault . . . .").

[122] *See* AFI 90-6001 § 1.1 ("The SAPR Program reinforces the Air Force's commitment to prevention through the development, implementation and assessment of policies and programs to prevent and respond to sexual assault. . . . The Air Force's goal is to provide exemplary support throughout victim reporting, response, victim advocacy, investigations and offender accountability when a sexual assault occurs."); AFI 90-6001 § 3.7 ("Accurate reporting of sexual assaults remains a key component of the Sexual Assault Prevention and Response program.").

[123] *See Vincennes Steel Corp.*, 194 Ark. at 62–63, 106 S.W.2d at 175.

such a report is not just complying with the general law of the state, but also complying with a workplace regulation placed on her by the school. And so she is at least in part advancing the interests and goals of her employer. Mr. Howell's actions in our case are no different.

The second problem is that the United States seems to believe that the scope-of-employment inquiry is a purely subjective one, focused solely on the motivations of the employee. The implication of the United States' argument is that where the motivations are purely personal, the action is taken outside of the scope of employment.[124] But that's not entirely right. The relevant inquiry is whether the employee was "carrying out the object and purpose of the enterprise, as opposed to acting exclusively in his own interest."[125] It is true that the employee's motivation for an act is not entirely irrelevant to the inquiry.[126] But the question of whether the employee was "carrying out the object and purpose of the enterprise" is a mostly objective inquiry, focused on the fit between the employee's job duties and the employee's actions.[127]

Here's why the inquiry must be primarily objective. Some people do not like their jobs. And yet those people regularly show up for work, follow workplace regulations, and execute the required tasks of their jobs. They do these things not because they particularly care for the health or success of the enterprises under which they are employed. They do these things so that they

---

[124] *Cf.* Br. in Opp'n to Pet. for Substitution (Doc. 72) at 7–8.

[125] *Razorback Cab of Fort Smith, Inc.*, 304 Ark. at 327, 802 S.W.2d at 446. Mr. Howell and the United States seem to be in agreement that the language just cited—or very similar language—correctly describes the rule for determining whether an action occurred within the scope of employment under Arkansas law. *Compare* Br. in Opp'n to Pet. for Substitution (Doc. 72) at 5, *with* Reply in Supp. of Pet. for Substitution (Doc. 74) at 3–4; *see also* Jan. 30, 2025 Substitution Hr'g Tr. (Rough) at 17–18, 51–52.

[126] *See Regions Bank & Tr.*, 345 Ark. at 566–67, 49 S.W.3d at 114–15; *Am. Ry. Express Co. v. Mackley*, 148 Ark. 227, 233, 230 S.W. 598, 599–600 (1921).

[127] *See Vincennes Steel Corp.*, 194 Ark. at 63, 106 S.W.2d at 175 ("The fact that the servant acts also for himself, while performing service for his employer, . . . will not exonerate the employer from responsibility for misconduct of the servant." (quoting *Healey v. Cockrill*, 133 Ark. 327, 331–32, 202 S.W. 229, 230 (1918)).

will be paid and will not be fired. Their subjective motivations for their actions are purely personal. But, of course, those actions nonetheless fall within the scope of their employment.

To support its purely-personal-motivation theory, the United States principally relies on *Cooper Clinic, P.A. v. Barnes*.[128] In that case, the Arkansas Supreme Court held that a doctor was acting outside of the scope of her employment when she failed to fulfill her mandatory reporting requirement.[129] But that case is inapposite. The duty to report in *Cooper Clinic* was created by state statute rather than by the employer.[130] And the doctor in *Cooper Clinic* had that duty by virtue of being a licensed physician, rather than by virtue of her employment at the clinic.[131] That's very different from the instant case, where the mandatory reporting requirement that applied to Mr. Howell was created by Mr. Howell's employer and applied to Mr. Howell by virtue of his status as an employee.[132]

In sum, the Court concludes that Mr. Howell was acting well within the scope of his employment when he reported the alleged rape to Capt. Sugg and the Sexual Assault Response Coordinators. Accordingly, the United States will be substituted as the defendant for Mr. Skaggs's abuse of process and false light invasion of privacy claims against Mr. Howell arising out of said reporting.

**B. The Statements to Local Law Enforcement**

There's not much in the record about Mr. Howell's statements to local law enforcement. In fact, there isn't anything at all about these statements in the *written* record. It was only at oral

[128] *See* Br. in Opp'n to Pet. for Substitution (Doc. 72) at 5–6 (citing *Cooper Clinic, P.A. v. Barnes*, 366 Ark. 533, 237 S.W.3d 89 (2006)).

[129] *See Cooper Clinic*, 366 Ark. at 541, 237 S.W.3d at 93.

[130] *See id.* at 535, 237 S.W.3d at 89.

[131] *See id.*

[132] *See* AFI 90-6001 § 3.7.3.

argument that the Court learned that Mr. Howell made some kind of statements about the rape to local law enforcement.[133] At the hearing, Mr. Howell's counsel explained that Mr. Howell "was called in and asked questions" by local law enforcement.[134]

It is unfortunate that the Court knows so little about the contents of Mr. Howell's statements to local law enforcement. That is because determining whether statements were made within the scope of Mr. Howell's employment requires the Court to examine the outer reaches of Arkansas's scope-of-employment doctrine. Ultimately, the Court concludes that Mr. Howell was acting within the scope of his employment when he spoke to local law enforcement about the alleged rape. But it's a very close call.

The Air Force's own statements and policies make it abundantly clear that the prevention of sexual assault is one of its primary organizational goals. AFI 90-6001 states that "[s]exual assault . . . violates the standards the United States of America expects of its men and women serving in the Air Force and is inconsistent with the Air Force['s] core values . . . ."[135] Elsewhere, Air Force regulations explain that the Air Force "will not tolerate sexual assault" because it "undermines [Air Force] mission readiness, directly contradicts [Air Force] core values, and erodes the trust and confidence upon which [the] institution is built."[136] That is why "[a]ll Airmen

---

[133] *Compare* Substitution Hr'g Tr. (Rough) at 23 (the Court stating that, "[q]uite frankly, in the record, I don't think there is any indication that Mr. Howell had anything to do with the police department whatsoever, but we'll see"), *with id.* at 25 (Mr. Howell's counsel stating that "[Mr. Howell] was called in [to the police department] and asked questions. I think he was interviewed"). One consequence of this fact is that the parties' briefs only discuss the statements Mr. Howell made to his military superiors. This adds yet another layer of difficulty for the Court.

[134] *Id.* at 25. The Court can and does accept this representation as true for purposes of deciding the instant Petition. *See Nesbitt v. Candler County*, 945 F.3d 1355, 1357 (11th Cir. 2020) (citing *Crowe v. Coleman*, 113 F.3d 1536, 1542 (11th Cir. 1997)). No party has indicated disagreement with this representation. For his part, Mr. Skaggs's counsel indicated that the representation accorded with what he understood to be the case based on his preparation for the hearing. Substitution Hr'g Tr. (Rough) at 61. And the United States did not take any position on whether Mr. Howell spoke to local law enforcement.

[135] AFI 90-6001 § 1.4.

[136] AFI 1-1 § 1.7.4.5.

have the enduring responsibility to foster a climate of dignity and respect and to promote and ensure a culture that will not tolerate sexual assault or behaviors that support it."[137] Over and over again, official Air Force regulations demonstrate that the Air Force believes that prevention of sexual assault is one of the central objects and purposes of its enterprise—an object and purpose directly related to the branch's fighting ability.

Air Force regulations also demonstrate that the organization believes that the reporting of sexual assaults is key to achieving its goal of preventing sexual assault. Section 3.7.3 is a prime example. The mandatory reporting requirement it creates—and the UCMJ penalties faced by Airmen who fail to fulfill that requirement—is good evidence that the Air Force believes good-faith reporting is an essential tool in combatting the prevalence of sexual assault.[138] But § 3.7.3 isn't the only part of AFI 90-6001 that suggests the importance of reporting. Section 3.7.4 of AFI 90-6001 "strongly encourage[s]" Air Force servicemen or civilian employees who are not mandatory reporters to report sexual assault incidents of which they become aware.[139] And § 3.7.4 details at length the process for reporting and for responding to those reports.[140] The Air Force would not have these organizational mandates, encouragements, and reporting structures in place if it did not strongly believe that reporting sexual assault is an action that advances the organizational purpose of preventing sexual assault.

As a general matter, actions that tend to reduce the possibility of sexual assault in the armed forces would seem to advance the Air Force's purpose of preventing sexual assault. And good-faith reports of sexual assaults committed by servicemembers would seem to fall under that umbrella.

[137] *Id.*

[138] *See* AFI 90-6001 § 3.7.3.

[139] AFI 90-6001 § 3.7.4.

[140] *Id.*

Still, there is obviously a large difference between reporting a sexual assault inside the military structure and reporting a sexual assault to local law enforcement. There is an even larger difference between reporting a sexual assault inside the military and aiding a local law enforcement sexual-assault investigation initiated by someone else. No regulation—at least not any regulation relevant to this case—requires military personnel to report sexual assaults committed by other military personnel to local law enforcement or to aid in a sexual-assault investigation conducted by local law enforcement. So Mr. Howell's statements to local law enforcement were not required by any workplace regulation or other directive given by his employer.

Had Mr. Howell's statements to local law enforcement been made in the absence of his prior report to the appropriate military authorities, the Court would conclude that his statements were made outside the scope of his employment. But that is not the situation we have here. In this case, Mr. Howell first made a report to the proper military authorities, as he was required to do by § 3.7.3.[141] The military authorities then contacted local law enforcement, who in turn contacted Mrs. Howell.[142] Subsequently, the military authorities told Mr. Howell that, because the conduct took place off base, a civilian law enforcement investigation would have to be initiated before an Air Force investigation could be initiated.[143] And one of the military's Sexual Assault Response Coordinators (Capt. Lang) went to the local police station with Mrs. Howell and assisted her in filing the necessary report.[144] The bottom line here is that the military appeared to be actively involved in initiating and advancing the local law enforcement investigation.

[141] Ex. A (First Benjamin Howell Aff.) to Defs.' Br. in Resp. to Mot. to Remand (Doc. 19-1) ¶¶ 4–6.

[142] Ex. A (Whitney Howell Aff.) to Whitney Howell's Mot. for Partial Summ. J. (Doc. 81-1) ¶¶ 7–8.

[143] *Id.* ¶ 10.

[144] *Id.* ¶ 11.

In these very narrow circumstances, Mr. Howell's statements to local law enforcement were made within the scope of his employment. The military had to have contemplated that Mr. Howell would be asked to provide a statement during the local law enforcement investigation. And it is reasonable to believe that the military wanted Mr. Howell to cooperate with a local law enforcement investigation initiated—to some extent—by the military. Considering the level of entwinement between the military and local law enforcement investigations, as well as the participation of military personnel in the initiation and advancement of the local law enforcement investigation, Mr. Howell advanced the Air Force's goal of eliminating sexual assault from the armed forces when he aided the local law enforcement investigation. So, while Mr. Howell also had personal motives in making his statements to local law enforcement, his actions simultaneously advanced the object and purpose of his employer. And under Arkansas law, that's enough to place his actions within the scope of his employment.

Recall that an employee's conduct—even tortious or intentionally tortious conduct—is considered to be within the scope of employment if it is "not unexpectable in view of the duties of the [employee]."[145] Then consider what occurred leading up to Mr. Howell's statement: Mr. Howell reported the alleged rape to the Air Force as required by § 3.7.3, the Air Force notified the Cabot Police Department (thus initiating the local law enforcement investigation), and an Air Force officer accompanied and assisted Mr. Howell's wife in making her report to the Cabot Police Department.[146] Considering this chain of events, Mr. Howell making a statement to the Cabot

---

[145] *See Regions Bank & Tr.*, 345 Ark. at 567, 49 S.W.3d at 115 (quoting *Life & Cas. Ins. Co. of Tenn.*, 241 Ark. at 355, 407 S.W.2d at 729).

[146] *See supra* pages 5–7.

Police Department wasn't just "not unexpectable"—it was in fact fully expectable in view of his initial duty to make a report to the military.[147]

The Court acknowledges that this fact pattern presents an edge case. Reasonable minds could differ on the appropriate resolution. But, for the reasons set out above, the Court concludes that Mr. Howell furthered his employer's interests (in a manner consistent with and expectable in view of his job duties) by making statements to local law enforcement about the alleged rape. He was not acting exclusively in his own interest. Accordingly, the United States will be substituted as the defendant for the defamation, abuse of process, and false light invasion of privacy claims brought against Mr. Howell that arise out of Mr. Howell's statements to local law enforcement.

---

[147] To put a finer point on it, the relevant caselaw doesn't require that, in order to fall within the scope of employment, the employee's conduct was done pursuant to an affirmative duty handed down by an employer. The employee's conduct must merely have been "not unexpectable *in view of the duties* of the [employee]." *Regions Bank & Tr.*, 345 Ark. at 567, 49 S.W.3d at 115 (quoting *Life & Cas. Ins. Co. of Tenn.*, 241 Ark. at 355, 407 S.W.2d at 729) (emphasis added). And, as just explained, the local-law-enforcement reporting was not unexpectable in view of (1) Mr. Howell's duty to report the alleged rape to his military superiors, and (2) the Air Force's involvement in the initiation of the local law enforcement investigation.

A comparison with relevant caselaw confirms this conclusion. Cases where the Arkansas Supreme Court has concluded that an employee's action was unexpectable in view of his duties (and therefore outside the scope of employment) have frequently involved an employee assaulting someone on the job. *See, e.g.*, *Regions Bank & Tr.*, 345 Ark. at 566–67, 49 S.W.3d at 114–15 (finding the sexual assault of a semi-comatose quadriplegic nursing home patient by a nursing assistant was not expectable in view of the assistant's duties); *Porter*, 329 Ark. at 137, 948 S.W.2d at 86 (finding the sexual assault of a patient by a radiology technician was not expectable in view of the technician's duties); *see also Am. Ry. Express Co.*, 148 Ark. at 233, 230 S.W. at 600 (finding an employee murdering a customer was not within the scope of employment, despite the fact that the motivating dispute arose in the course of the employee's job duties, because the employer "was not advised" of the employee's "personal resentment[] or injured pride," and "because it was a matter in which the [employer] had no concern"). *But see Razorback Cab*, 304 Ark. at 326–27, 802 S.W.2d at 446 (finding a cab driver's fistfight with a customer was within the scope of the driver's employment because the driver's "underlying purpose . . . was the comfort and welfare of other passengers"); *Life & Cas. Ins. Co. of Tenn.*, 241 Ark. at 355, 407 S.W.2d at 729 (holding there was substantial evidence to support finding employee's assault of a customer was within the scope of employment because "[f]or a quarrel to arise in the course of an employee's attempt to collect money is certainly 'not unexpectable'"). That's nothing like what happened here. Mr. Howell's statements to local law enforcement have a clear logical connection with his mandatory report to military authorities. Reporting an alleged rape to military superiors pursuant to a duty of Air Force employment and discussing that same alleged rape with local law enforcement are not identical acts. But they are certainly similar, and the justifications for the former can also justify the latter. *See supra* page 23. In view of the similarities between the relevant job duty (intra-military reporting under § 3.7.3) and the statements to local law enforcement—and especially given the Air Force's actual involvement in both processes—the Air Force had more than sufficient reason to expect Mr. Howell to make statements to local law enforcement as part of the overall reporting process.

## CONCLUSION

Mr. Howell's Petition is GRANTED in full.[148] The United States is ordered to be substituted as the defendant with respect to all claims of defamation, abuse of process, and false light invasion of privacy brought against Mr. Howell.

IT IS SO ORDERED this 11th day of June 2025.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

[148] Doc. 67.